**MILLE LACS BAND OF CHIPPEWA INDIANS, Arthur Gahbow, Walter Sutton, Carleen Benjamin, and Joseph Dunkley, Plaintiffs,**

and

**United States of America, Plaintiff–Intervenor,**

v.

**STATE OF MINNESOTA, Minnesota Department of Natural Resources, and Rod Sando, Commissioner of Natural Resources, Defendants,**

and

**John W. Thompson, Jenny Thompson, Joseph N. Karpen, LeRoy Burling, Glenn E. Thompson, and Gary M. Kiedrowski, and the Counties of Aitkin, Benton, Crow Wing, Isanti, Kanabec, Mille Lacs, Morrison, Pine, and Sherburne, Defendants–Intervenors.**

Civ. No. 4–90–605.

United States District Court, D. Minnesota, Fourth Division.

May 13, 1994.

Jeffry Robert Chaffee, Jennifer Ann Fahey, Joint Powers Bd., Mora, MN, for intervenor Sherburne County, substituted for Chisago County.

William Arthur Szotkowski, Stephen Bruce Masten, Jerilyn K. Aune, Sp. Asst. Atty. Gen., Michelle E. Beeman, Office of MN Atty. Gen., St. Paul, MN, for defendants State of MN, MN Dept. of Natural Resources, Joseph Alexander, Com'r of Natural Resources.

Lawrence A.G. Moloney, Doherty Rumble & Butler, Minneapolis, MN, Gregg J. Tucek, for intervenor-defendant Save Lake Mille Lacs Ass'n.

Randy V. Thompson, Stephen G. Froehle, Gary E. Persian, Persian MacGregor & Thompson, Minneapolis, MN, for intervenors-defendants John W. Thompson, Jenny Thompson, Joseph N. Karpen, LeRoy Burling, Glenn E. Thompson, Gary M. Kiedrowski.

George Cardinal, Me–Da–We Grand Medicine Soc., pro se.

Zenas Baer, Wefald & Baer, Hawley, MN, for interveners Dale Hanks, Chief Hole in the Day VII, individually, and on behalf of MS Band of Chippewa Indians.

Robert Michael Small, U.S. Atty. Office, Minneapolis, MN, William A. White, Sheila A. Hackett, U.S. Dept. of Justice, Indian Resources Section, Environmental and Natural Resources Div., Washington, DC, for intervenor-plaintiff U.S.

James M. Genia, Mille Lacs Band of Ojibwe, Onamia, MN, Marc D. Slonim, John B. Arum, Ziontz Chestnut Varnell Berley & Slonim, Seattle, WA, for plaintiffs Mille Lacs Band of Chippewa Indians, Arthur Gahbow, Walter Sutton, Carleen Benjamin, Joseph Dunkley.

James M. Johnson, Johnson Law Office, Olympia, WA, Jeffry Robert Chaffee, Jennifer Ann Fahey, Joint Powers Bd., Mora, MN, for defendants-interveners County of Aitkin, County of Benton, County of Chisago, County of Crow Wing, County of Isanti, County of Kanabec, County of Mille Lacs, County of Morrison, County of Pine.

## MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, Chief Judge.

This action arises out of language in a 1837 Treaty between the United States and the Chippewa Indians which "guaranteed" the Chippewa "the privilege of hunting, fishing and gathering the wild rice upon the lands, the rivers and the lakes included in the territory ceded ... during the pleasure of the President." Article V, 1837 Treaty, 7 Stat. 536 (1837 Treaty). Plaintiffs the Mille Lacs Band of Chippewa Indians, Arthur Gahbow, Walter Sutton, Carleen Benjamin, and Joseph Dunkley (collectively the Band) brought this action against the State of Minnesota,

the Minnesota Department of Natural Resources, and Rod Sando, Commissioner of Natural Resources (collectively the State) alleging that the State has adopted and enforced natural resource laws and regulations that violate the Band's hunting, fishing, and gathering rights under the 1837 Treaty. The Band seeks a declaratory judgment that it retained rights under the treaty, definitions of the nature and scope of those rights, and definition of permissible state regulation of those rights. It also seeks an injunction barring state interference with its rights under the 1837 Treaty. The Band does not seek any money damages.

Jurisdiction is invoked under three statutes. Plaintiffs allege that the court has jurisdiction under 1) 28 U.S.C. § 1331 because this action arises under the Constitution, laws, and treaties of the United States; 2) 28 U.S.C. § 1343(a)(3) and (4) because plaintiffs seek relief under 42 U.S.C. § 1983 on the theory that the State's enforcement of its conservation laws has prevented or interfered with the exercise of rights under the 1837 Treaty in violation of that treaty, the Due Process Clause of the Fourteenth Amendment, and the Supremacy Clause of the Constitution, and 3) 18 U.S.C. § 1362 because it is an action brought by an Indian band with a governing body duly recognized by the Secretary of the Interior and the matter in controversy arises under the Constitution, laws, and treaties of the United States.

The case has been divided into two phases. The first phase will determine whether the Band retains any rights under the Treaty and whether those rights extend to land owned privately. If it were determined that the Band retains rights under the Treaty, then the validity of state laws regulating those rights would have to be examined.

On April 5, 1993, nine counties [1] (the Counties) and six landowners [2] (the Landowners) were granted intervention as defendant-intervenors. On December 16, 1993, the United States of America was granted intervention as a plaintiff-intervenor.

Now before the court are three motions by the Band for partial summary judgment on defenses asserted by the defendants and defendant-intervenors. The State has filed a cross-motion for summary judgment seeking judgment in its favor based upon several defenses including Eleventh Amendment immunity, failure to join indispensable parties, and statute of limitations. The State has also filed a motion for summary judgment on Phase I merits, based upon the Executive Order of 1850, the Treaty with the Chippewa of 1855, and the doctrine of collateral estoppel. The United States has also filed a motion to dismiss the Landowners' counterclaims.

## I.

On a motion for summary judgment, all evidence and inferences must be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986); *AgriStor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987). The moving party must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). A fact is material if it affects the outcome of the case. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

## II.

The Band moves for summary judgment on miscellaneous defenses asserted by the State, Landowners, and Counties including 1) delay based defenses; 2) governmental and personal immunity defenses; and 3) the defense that the Band and the State and its officers acting within their official capacities are not persons within the meaning of 42 U.S.C. § 1983. The State filed a cross motion seeking summary judgment on four

---

1. The Counties are Aitkin, Benton, Crow Wing, Isanti, Kanabec, Mille Lacs, Morrison, Pine, and Sherburne.

2. The landowners are John W. Thompson, Jenny Thompson, Joseph N. Karpen, LeRoy Burling, Glenn E. Thompson, and Gary M. Kiedrowski.

grounds: 1) that the action is barred by the statute of limitations and laches, 2) that the Band's claims must be dismissed for failure to join indispensable parties under Fed. R.Civ.P. 19, 3) that the Band's claims are barred by the Eleventh Amendment and 4) that the court should abstain under *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

## A.

The State, Counties, and Landowners assert that the Band's claims are barred by "laches, waiver, estoppel and adverse possession." State's Answer ¶ 14; Counties' Answer ¶ 10. The Landowners also raise affirmative defenses of "release" and "the applicable statute of limitations" as additional defenses. Landowners' Joint Answer, 5th Affirmative Defenses.

■ Plaintiffs argue that these defenses may not be raised against the United States. Delay based defenses may not be asserted against the United States. *See Board of Comm'rs v. United States,* 308 U.S. 343, 351, 60 S.Ct. 285, 288, 84 L.Ed. 313 (1939) ("state notions of laches and state statutes of limitations have no applicability to suits by the Government, whether on behalf of Indians or otherwise"). None of the delay based defenses raised by the State, Landowners, and Counties may therefore be asserted against the United States.

Plaintiffs argue that the issue of whether the delay based defenses apply to the Band is moot because they seek the same relief. The State responds that the issues are not moot because the Eleventh Amendment protects it from suits by the Band regardless of whether it is protected from suits by the United States.

■ In *Arizona v. California,* 460 U.S. 605, 613–14, 103 S.Ct. 1382, 1388–89, 75 L.Ed.2d 318 (1983), after the United States brought suit against several states for water rights on behalf of Indian tribes, the tribes were permitted to intervene. The Eleventh Amendment does not bar the United States from suing a state, *id.* at 613–14, 103 S.Ct. at 1388–89, and the Court reasoned that:

[t]he Tribes do not seek to bring new claims or issues against the States, but only ask leave to participate in an adjudication of their vital water rights that was commenced by the United States. Therefore, our judicial power over the controversy is not enlarged by granting leave to intervene, and the States' sovereign immunity protected by the Eleventh Amendment is not compromised.

*Id.* at 614, 103 S.Ct. at 1389. *See also Maryland v. Louisiana,* 451 U.S. 725, 745, n. 21, 101 S.Ct. 2114, 2128, n. 21, 68 L.Ed.2d 576 (1981) (agreeing with the Special Master's recommendation that the United States and several pipeline companies be allowed to intervene in a suit against defendant Louisiana). The United States and the Band seek identical relief in this action. The Band's presence does not enlarge the claims that could be and are asserted by the United States. Under *Arizona v. California* the Band would be allowed to intervene if the action had been instituted by the United States, regardless of any delay based defenses. The Band should not be barred from asserting its interests in this action by any delay based defenses merely because it filed the suit before the United States intervened. The Band's motion for summary judgment on the delay based defenses should be granted.

## B.

Even assuming that the delay based defenses could be asserted against the Band despite the presence of the United States as a plaintiff-intervenor, the Band has shown that it is entitled to summary judgment on the delay based defenses asserted by defendants and defendant-intervenors.

■ The Landowners argue that the Band's direct Treaty claim is barred by the six year statute of limitation period in 28 U.S.C. § 2401(a) which provides that civil actions against the United States must be brought within six years after the right of action first accrues. The Band responds that this statute of limitations applies only to actions brought against the United States.

The Band has asserted a direct claim for relief based on a treaty pursuant to 28 U.S.C. § 1362. Under that statute district courts

have original jurisdiction over any action brought by an Indian band involving treaties of the United States. Claims brought directly under a treaty are distinct and independent from Section 1983 claims. *U.S. v. Washington,* 813 F.2d 1020 (9th Cir.1987) (holding that an award of attorney fees was not appropriate because plaintiffs had established only treaty interpretation claims, not claims under 42 U.S.C. § 1983). The statute of limitations in 28 U.S.C. § 2401 applies only to claims against the United States. The Band has not asserted any claims against the United States, and 28 U.S.C. § 2401 does not bar its claims.

■ The Landowners also suggest that Minnesota's statute of limitations for contract actions should be applied to the Band's treaty claims. The Counties argue that the six year limitations period should be applied to the treaty claims because it has been used in cases alleging violations of the Civil Rights Act of 1871 and 42 U.S.C. § 1985. The Band responds that no state statute of limitations controls.

■ "There is no federal statute of limitations governing federal common-law actions by Indians to enforce property rights." *Oneida County, N.Y. v. Oneida Indians,* 470 U.S. 226, 240, 105 S.Ct. 1245, 1254, 84 L.Ed.2d 169 (1985). If there is no federal statute of limitations, normally a state statute of limitations for an analogous action is borrowed. *Id.* A state statute of limitations should not be borrowed, however, if borrowing would be inconsistent with federal policies. *Id.*

When Congress established limitations for certain claims brought by the United States on behalf of Indians, it excluded actions by Indians "to establish the title to, or right of possession of real or personal property" from statutes of limitation. 28 U.S.C. § 2415(c). Congress has repeatedly affirmed its intention to exclude suits by Indians for property rights from any statute of limitations. *Oneida,* at 241–42, 105 S.Ct. at 1255. The Band's treaty claims seek to establish their usufructuary rights. Although these rights are not rights or interests in real property, they are valuable property rights protected by the Constitution. *Muckleshoot Indian Tribe v.*

*Hall,* 698 F.Supp. 1504, 1516 (W.D.Wash. 1988). Borrowing a statute of limitations would be inconsistent with the Congressional intent that no statute of limitations would govern a suit by Indians for property rights. *Id.* 470 U.S. at 242, 105 S.Ct. at 1255–56. The Band's treaty interpretation claims are not barred by any statute of limitations. The Band has shown that it is entitled to judgment as a matter of law on the statute of limitations defense against its treaty claims.

### C.

■ The Band also alleges a claim for relief under 42 U.S.C. § 1983. The Section 1983 claim has been generally described as a theory that the State's enforcement of its conservation laws has prevented or interfered with the exercise of rights guaranteed by the 1837 Treaty. According to the Band, the State's interference with usufructuary rights violates the Due Process Clause of the Fourteenth Amendment and the Supremacy Clause of the Constitution. The Band invokes jurisdiction for its Section 1983 claim under 28 U.S.C. § 1343(a)(3) and (4).

The State, Landowners, and Counties argue that the Band's claims under Section 1983 are subject to the 2 year statute of limitations for personal injury cases in Minnesota. They contend that the statute has run because the Band's injury accrued more than two years before it filed this complaint. According to the State, its intention to enforce conservation laws against the Band was clear as early as 1858 when the Minnesota legislature publicly stated that it would subject off-reservation Indians to its hunting and fishing regulations. The State argues that the Band was at least aware of its potential claims in 1987 when the Band was informed that no usufructuary rights would be recognized by the State unless a court ordered it to recognize those rights.

The Band responds that no state statute of limitations should be borrowed for its Section 1983 claims because borrowing a limitations period would be inconsistent with federal policy. *Oneida,* at 244, 105 S.Ct. at 1256.

■ Claims under Section 1983 are subject to the general personal injury statute of

limitations in the jurisdiction where the claim arises. *Owens v. Okure,* 488 U.S. 235, 249–50, 109 S.Ct. 573, 581–82, 102 L.Ed.2d 594 (1989). The personal injury statute of limitations in Minnesota in 2 years. Minn.Stat. § 541.07(1) (1992). The injury accrues when the plaintiff "knows or has reason to know" of the injury that is the basis of the action. *See, e.g., Leon v. Murphy,* 988 F.2d 303, 309 (2d Cir.1993).

Assuming that the two year statute of limitations applies to the Band's Section 1983 claims regardless of *Oneida,* the Band had reason to know that the State would not recognize any usufructuary rights under the 1837 Treaty in 1987 when it received a letter stating that Minnesota would not recognize any such rights unless ordered to by a court. The complaint was filed on August 13, 1990 more than two years after the Band received the 1987 letter.

Even if a state limitations period were borrowed, the Band asserts that its Section 1983 claims would not be barred because there has been a continuing violation of Indian rights. According to the Band, the State commits a new violation of the treaty and Section 1983 each time that Band members are required to pay a license fee or are prosecuted for alleged violations of conservation laws. It argues that no statute of limitations could prevent an individual Band member from asserting a treaty rights defense to a prosecution and that it should therefore be allowed to sue to prevent any prosecutions from occurring.

The State, Counties, and Landowners respond that the statute of limitations should not be tolled under a continuing violation theory. They maintain that the Band is merely feeling the present effects of a past discriminatory policy established in the nineteenth century. The State contends that the statute of limitations may not be avoided "merely by asserting that the appellants' declaratory judgment suit was brought to establish defenses against the rainy day, in the future, when the Ordinance might be enforced against them." *Gilbert v. City of Cambridge,* 932 F.2d 51, 58 (1st Cir.1991).

"A statute of limitations may not begin to run on a continuing wrong till the wrong is over and done with." *Taylor v. Meirick,* 712 F.2d 1112, 1118 (7th Cir.1983). *See also, Fletcher v. Union Pac. R.R. Co.,* 621 F.2d 902, 908 (8th Cir.1980) (applying continuing wrong doctrine to FELA case). A plaintiff who is feeling the present effects of a past discriminatory action, however, may not rely on the continuing violations theory to avoid a statute of limitations. *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980) (injury occurred when plaintiff denied tenure, not when he was terminated one year later); *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 557–58, 97 S.Ct. 1885, 1888–89, 52 L.Ed.2d 571 (1977) (injury occurred when flight attendant fired, not when she was rehired several years later without seniority credit for her earlier service).

Viewing the facts in the light most favorable to the Band, the Band may have usufructuary rights under the 1837 Treaty. If the Band continues to have usufructuary rights under the treaty, then the State's continued enforcement of its conservation laws against Band members may violate these rights. The State has arrested Band members for disobeying conservation laws over the past two years and required Band members to purchase licenses. Those actions may be the most recent wrongs in a continuing violation by the State.

The State has not shown that it is entitled to judgment as a matter of law on the Band's Section 1983 claims. The Band also has not shown that it is entitled to judgment as a matter of law on the statute of limitations defense asserted by the State, Landowners, and Counties toward the Band's Section 1983 claims. Both the Band's and the State's motions for summary judgment on this issue should be denied.

### D.

In its answer the State alleges that "the State and its officers acting within their official capacities are not persons within the meaning of 42 U.S.C. § 1983." State Answer ¶ 12. It also alleges that the Band is not a statutory person. State Answer ¶ 13. The

Band seeks judgment in its favor on this defense.

The Band believes that a state officer acting in his official capacity and the Band itself qualify as statutory persons. The State has not responded to the Band's arguments on these motions. The United States agrees that a state officer acting in his official capacity is a statutory person, but argues that the State itself is not a statutory person. It asserts that the issue of whether the Band is a statutory person should not be decided because it is novel and the individual plaintiffs are clearly statutory persons.

State officers acting in their official capacities are persons under Section 1983:

> Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because "official capacity actions for prospective relief are not treated as actions against the State."

*Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, n. 10, 109 S.Ct. 2304, 2312, n. 10, 105 L.Ed.2d 45 (1989) (quoting *Kentucky v. Graham,* 473 U.S. 159, 167, n. 14, 105 S.Ct. 3099, 3105–06, n. 14, 87 L.Ed.2d 114 (1985)). In this case plaintiffs seek declaratory and injunctive relief against defendants, including Sando, a state official in his official capacity. Under *Will* he is a person under Section 1983. The Band's motion for summary judgment on the State's defense that its officers acting in their official capacities are not persons under Section 1983 should be granted.

The parties do not dispute that the State itself is not a statutory person and so this defense may be viable for this party. *Quern v. Jordan,* 440 U.S. 332, 342–43, 99 S.Ct. 1139, 1146, 59 L.Ed.2d 358 (1979); *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 66, 109 S.Ct. 2304, 2309–10, 105 L.Ed.2d 45 (1989). The parties also do not dispute that the individual plaintiffs are statutory persons entitled to pursue Section 1983 claims.

■ The State has presented no arguments in support of its defense that the Band is not a statutory person. Labor unions, corporations, and non-profit organizations are all statutory persons. *See Metropolitan Life Ins. Co. v. Ward,* 470 U.S. 869, 881 n. 9,

105 S.Ct. 1676, 1683 n. 9, 84 L.Ed.2d 751 (1985) (corporation); *Allee v. Medrano,* 416 U.S. 802, 819 n. 13, 94 S.Ct. 2191, 2202 n. 13, 40 L.Ed.2d 566 (1974) (union); *NAACP v. Button,* 371 U.S. 415, 428, 83 S.Ct. 328, 335, 9 L.Ed.2d 405 (1963) (civil rights organization). "To find that tribes are ... 'other persons' [within the meaning of Section 1983] furthers the broad intent of Congress to provide a federal remedy for the abridgment of federally secured rights such as plaintiffs' treaty-based usufructuary rights by persons acting under color of state law." *Lac Courte Oreilles v. Wisconsin,* 663 F.Supp. 682, 691 (W.D.Wis.1987), *but see Coeur D'Alene Tribe of Idaho v. Idaho,* 798 F.Supp. 1443, 1452 (D.Idaho 1992) (finding that the plaintiff tribe was not a statutory person but not stating the reasoning). The Band's motion for summary judgment on the defense that the Band and Sando are not statutory persons should be granted, but denied on the defense that the State is not a statutory person.

**E.**

■ The State, Landowners, and Counties argue that the Band's claims are barred by a variety of other time delay defenses including laches and estoppel. The Band responds that the defendant and defendant-intervenors have not offered any legal authority in support of the application of common law defenses to an action to enforce federal treaty rights and that they have offered no evidence to support the application of those defenses to this case.

The Constitution provides that "all treaties made or which shall be made under the authority of the United States shall be the supreme law of the land; and judges in every state shall be bound thereby, anything in the constitution or laws of any state notwithstanding." U.S. Const. art. IV. The 1837 Treaty preempts state law and time delay defenses based on state law do not apply to Indian land title claims. *Oneida,* 470 U.S. at 240, n. 13, 105 S.Ct. at 1254–55, n. 13. The

Band is entitled to summary judgment on state law defenses including laches.[3]

### F.

■ The Band seeks summary judgment on the State's defense that it is protected from suit by the Eleventh Amendment. Plaintiffs argue that the claim of the United States cannot be barred by the Eleventh Amendment and that the issue is therefore moot because the Band and the United States seek identical relief.

The claim of the United States is not barred by the Eleventh Amendment. *Blatchford v. Native Village of Noatak,* 501 U.S. 775, 782–83, 111 S.Ct. 2578, 2583, 115 L.Ed.2d 686 (1991); *United States v. Minnesota,* 270 U.S. 181, 195, 46 S.Ct. 298, 301, 70 L.Ed. 539 (1926). Since the Band and the United States seek the same relief in this action, Minnesota's sovereign immunity is not compromised. *Arizona v. California,* 460 U.S. 605, 613–14, 103 S.Ct. 1382, 1388–89, 75 L.Ed.2d 318 (1983). The Band's motion for summary judgment on the Eleventh Amendment defense should be granted.[4]

■ Even if the United States were not a plaintiff-intervenor in this suit, the Band argues that its claims against the Commissioner of Natural Resources would be permissible under *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The State responds that the *Ex parte Young* exception does not apply because the relief sought by the Band would require the court to compel discretionary acts. It also points out that the claims against the Commissioner of Natural Resources are actually against the state itself, not its officer. *Seminole Tribe v. Florida,* 11 F.3d 1016, 1028–29 (11th Cir.1994).

■ A suit seeking prospective relief against state officials acting in their official capacity does not violate the Eleventh Amendment, but suits seeking to compel executive officials to perform a discretionary task and suits that are in reality against the state are not permitted. *Ex Parte Young,* 209 U.S. at 158, 28 S.Ct. at 453; *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101–102, 104 S.Ct. 900, 908–09, 79 L.Ed.2d 67 (1984).

In *Seminole Tribe* the plaintiffs sought to compel state officials to negotiate a compact under the Indian Gaming Regulatory Act (IGRA). The Eleventh Circuit found that the state's decision whether to negotiate with Indian tribes under IGRA was a discretionary task. *Seminole Tribe* at 1028–29. It also found that the suit was, in reality, against the state itself because the duties identified in IGRA were those of the state, not state officials. *Id. Ex parte Young* did therefore not apply. *Id.*

In this suit, the Band seeks only prospective relief. It is suing a state official in his official capacity in order to enforce federal law. There is no evidence that the suit is, in reality, against the State itself. Although the design and implementation of fish and game policies may be a discretionary act, the Band is not attempting to force the officials to adopt a specific policy. It is merely seeking a definition of its rights under the 1837 Treaty and a declaration of the effect that those rights have on state conservation policies. The Band's claims against the Commissioner of Natural Resources are within the scope of *Ex parte Young:*

> The general discretion regarding the enforcement of the laws when and as he deems appropriate is not interfered with by an injunction which restrains the state officer from taking any steps towards the enforcement of an unconstitutional enactment to the injury of complainant. In such case no affirmative action of any nature is directed, and the officer is simply prohibited from doing an act which he had no legal right to do.

*Ex parte Young,* 209 U.S. at 159, 28 S.Ct. at 453.

---

3. The Landowners argue that the doctrine of release applies here, but this case involves a dispute about rights allegedly established by a treaty, rather than by aboriginal title as in the case they cite. *United States v. Santa Fe Pac. R.R.,* 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941).

4. Moreover, the State does not dispute that state officials are subject to official capacity actions brought by individual Indian plaintiffs.

The State also argues that the Supreme Court indicated that it may no longer allow such suits when it remanded the issue of whether a Native Alaskan village could seek prospective relief against a state official to the Ninth Circuit for its initial consideration. *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 788, 111 S.Ct. 2578, 2586, 115 L.Ed.2d 686 (1991). It believes the Court would have remanded the issue directly to the district court unless it were questioning the distinction between prospective and retrospective relief. The State contends that the principle of mutuality requires that state officials be immune from suit by Indian tribes for prospective relief if Indian officials are immune from suit by the state.

The Band responds that mutuality is not a barrier to suits against officials for prospective relief because states may sue Indian officials for prospective relief under *Ex parte Young*. It argues that the Court's action in remanding the issue of whether the claims for injunctive relief were barred does not foretell the Court's position on the Eleventh Amendment. The Band contends that even if *Blatchford* were read to forecast that the Court may reconsider the distinction between retrospective and prospective relief in future cases, speculation about future decisions would be inappropriate.

In *Blatchford* a Native Alaskan village sued a state official alleging that a state program violated the Equal Protection Clause. *Blatchford* at 777–78, 111 S.Ct. at 2580. It sought damages and injunctive relief. The Court held that the Eleventh Amendment barred the village's claims for damages, but it remanded the issue of whether the claims for injunctive relief were barred. *Id.* at 788, 111 S.Ct. at 2586.

The Native Alaskan village had argued that it could sue state officials for damages because the states had waived their immunity against Indian tribes when they adopted the Constitution. *Id.* at 775, 111 S.Ct. at 2581. The Court rejected this argument reasoning that Indian tribes are immune to suit by the states and that "it would be absurd to suggest that the tribes surrendered immunity in a convention to which they were not even parties." *Id.* at 782–83, 111 S.Ct. at

2583. It concluded that "if the convention could not surrender *the tribes'* immunity for the benefit of the *States,* we do not believe that it surrendered the States' immunity for the benefit of the tribes." *Id.* (emphasis in original).

The Supreme Court's analysis did not consider whether *Ex parte Young* provided a basis for the village's injunctive claim. Even assuming that mutuality of suit is required for *Ex parte Young* actions as the State argues, courts have recognized suits by states against tribal officials acting in their official capacity. *See e.g., South Dakota v. Bourland,* 949 F.2d 984, 989 (8th Cir.1991), *rev'd on other grounds,* —— U.S. ——, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993); *Wisconsin v. Baker,* 698 F.2d 1323, 1332 (7th Cir.), *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3537, 77 L.Ed.2d 1388 (1983). Mutuality principles require that the Band be allowed to sue state officials acting in their official capacity.

The Court's decision to remand the claims seeking injunctive relief to the court of appeals rather than directly to the district court was not unusual. The court of appeals had not considered the claim for injunctive relief. *Blatchford* cannot be read as authority to disregard the long recognized distinction between prospective and retrospective relief supporting the *Ex parte Young* doctrine. A variety of reasons can be read into the remand action, but it would be speculation to rely on any one.

The Band is entitled to summary judgment on the State's Eleventh Amendment defense because the United States is seeking identical relief and the State's sovereign immunity is not compromised. *Arizona v. California,* 460 U.S. 605, 613–14, 103 S.Ct. 1382, 1388–89, 75 L.Ed.2d 318 (1983). Even if the United States were not a plaintiff-intervenor, the Band's suit against the Commissioner of Natural Resources falls within the *Ex parte Young* exception to the Eleventh Amendment. The Band's motion for summary judgment on the Eleventh Amendment defense should be granted.

### G.

The State claims that its officials are immune from suit under the doctrine of qual-

ified immunity. The Band argues that qualified immunity is not available because it has not sued the Commissioner of Natural Resources in his personal capacity.

Personal immunity defenses may not be asserted in actions brought against public officials in their official capacity. *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3111–12, 87 L.Ed.2d 114 (1985). The Band has not sued the Commissioner of Natural Resources in his personal capacity. The Band is entitled to summary judgment on any personal immunity defenses asserted by the State.

## H.

■ The State argues that the other Chippewa bands who signed the 1837 Treaty are indispensable parties to this litigation because the Band is seeking an allocation of fifty percent of the fish, game, and wild rice on the ceded territory. It asserts that a judgment for the Band could prejudice other tribes who might be entitled to portions of the reserved rights. It also contends that it could face the risk of multiple obligations. It asserts that this suit must be dismissed because the other tribes are immune from suit and cannot be joined.

The Band responds that it is not seeking any allocation of resources. According to the Band, it is only seeking a declaratory judgment that it has rights under the 1837 Treaty. It contends that the relief sought will not diminish the rights of any other tribe. It maintains that courts that have decided to allocate resources have provided a collective allocation for all tribes with treaty rights to harvest the resources at issue. *See, e.g., Washington v. Washington Commercial Passenger Fishing Vessel Ass'n.,* 443 U.S. 658, 685–89, 99 S.Ct. 3055, 3074–76, 61 L.Ed.2d 823 (1979); *Lac Courte Oreilles v. Wisconsin,* 740 F.Supp. 1400, 1416–19 (W.D.Wis. 1990). It also argues that Magistrate Judge Jonathan Lebedoff determined that other tribes were not necessary parties when he denied the motion by individuals from other Chippewa tribes to join this action. Even if the other tribes were necessary parties, the Band contends that they are not indispensable parties and that this action should proceed "in equity and good conscience" under Rule 19(b). It contends that the judgment could be tailored to address only the rights of this Band while resolving the dispute between the existing parties.

The State replies that practical realities of the scarcity of natural resources mean that allocation will be an issue regardless of whether the Band seeks it. Even if the court could fashion an allocation between Indians and non-Indians and leave the Indian portion to the 1837 tribe signatories to divide, the State contends that this allocation could not be enforced against the other tribes because of their sovereign immunity.

■ To determine whether a party is indispensable under Fed.R.Civ.P. 19, the court must first determine whether an absent party is necessary to the suit. If a necessary party cannot be joined, then the court must determine whether the party is indispensable so that in "equity and good conscience" the suit should be dismissed.

To determine if the absent party is necessary to the suit, the court must determine whether:

(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent judgments.

Fed.R.Civ.P. 19(a).

In this action the Band seeks only a declaratory judgment that it retained rights under the treaty, definitions of the nature and scope of those rights, and definition of permissible state regulation of those rights. It also seeks an injunction barring state interference with its rights under the 1837 Treaty. The first phase of the trial is limited to the issue of whether the Band retains any rights under the treaty and whether those rights extend to land owned privately. The Band seeks determination of its rights under

the 1837 Treaty vis-a-vis the State, not other tribes. Moreover, it seeks no allocation of resources.

Even if this suit eventually resulted in some sort of allocation between Indians and non-Indians, the ability of other bands to protect their own interests under the treaty would not be impaired because the allocation among Indians would not be decided. The defendants will not be exposed to any substantial risk of multiple or otherwise inconsistent obligations. The other bands are not necessary parties under Fed.R.Civ.P. 19(a).

■ The state asserts that the other bands are nonetheless indispensable parties under Rule 19(b). Joinder of the other tribes is not feasible because they have sovereign immunity from suit. If a necessary party cannot be made a party to the suit, the court must determine whether "in equity and good conscience" the action should be dismissed because the necessary party is indispensable to the suit. Fed.R.Civ.P. 19(b). Four factors are relevant to the issue:

> first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measure, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed.R.Civ.P. 19(b).

Application of these factors indicates that other tribes are not indispensable parties. A judgment entered in the absence of the other tribes would not prejudice those tribes because the only potential allocation that might be made would be among Indians and non-Indians. No allocation among Indians would be made. An allocation between Indians and non-Indians would be adequate to adjudicate the claims here. Finally, the Band would not have another adequate remedy if this action were dismissed for nonjoinder. The motion by the State for summary judgment on this issue should be denied.

## I.

■ The State argues that the court should abstain because this suit interferes with its system of enforcing conservation laws through the criminal process and that it is also interfering with pending prosecutions. It asserts that abstention is appropriate even if a plaintiff is mounting a systemic challenge to state policies or if seeking relief in the state court system would be futile.

The Band responds that abstention is inappropriate because the United States is suing to enforce federally protected rights. It argues that abstention would be inappropriate even if the United States were not a party, because the federal interests in protecting the federal tribal rights outweigh the State's interests. Abstention is also inappropriate because there are no on-going state court proceedings in which it would have an adequate opportunity to present its claims. It is not seeking to enjoin any pending criminal prosecutions, and it has different interests from the individuals prosecuted by the state. Moreover, this action had proceeded for three years before the State charged the defendants in the pending criminal prosecutions. Finally, the Band argues that this action will not unduly interfere with the state courts or the internal workings of the State's law enforcement system.

The State replies that federal interests, like Indian policy, are always implicated when a federal defense is raised to state court proceedings and that the *Younger* doctrine would be meaningless if it did not apply to the assertion of important federal interests. It asserts that the presence of the United States should not affect the application of the *Younger* doctrine because the United States has played an extremely limited role here. Abstention is appropriate even if the federal plaintiffs are not parties to the pending state proceeding. It contends that the Band is asking the court to use its equitable powers to modify complex state natural resource laws. The court should abstain to avoid interfering in its core sovereign functions.

"Federal court have a 'virtually unflagging obligation' to exercise the jurisdiction granted them by Congress." *Seneca–Cayuga*

*Tribe v. State ex rel. Thompson,* 874 F.2d 709, 711 (10th Cir.1989). A federal court may decline to hear a case seeking to enjoin a pending state proceeding, however, if the proceeding provides an adequate opportunity for the plaintiff to raise constitutional challenges and the state has an interest in the proceeding. *Postscript Enter. v. Peach,* 878 F.2d 1114, 1116 (8th Cir.1989). *Younger* abstention is supported by broad considerations of comity and federalism. *Younger v. Harris,* 401 U.S. 37, 43, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971).

Abstention is normally inappropriate if the United States is suing a state in federal court to assert its federal interests. *United States v. Composite State Bd. of Medical Examiners,* 656 F.2d 131, 136 (5th Cir.1981). The United States is a plaintiff-intervenor in this case seeking to advance important federal interests. Abstention would be inappropriate.

■■■ Even if the United States were not a plaintiff-intervenor, abstention would still be inappropriate. The Band is not a party to the pending criminal prosecutions and has no basis to intervene in them, it is not seeking to enjoin those proceedings, and there is evidence that the interests of the defendants in those actions differ from the Band's interests. Moreover, the central issue in this action is interpretation of the 1837 Treaty, raising issues of federal law. The State's interest in this suit is more minimal because the central issue does not involve state law. *Seneca–Cayuga Tribe* at 714.

Finally, abstention is inappropriate if the case has proceeded well beyond the embryonic stage. *Hawaii Housing Auth. v. Midkiff,* 467 U.S. 229, 238, 104 S.Ct. 2321, 2328, 81 L.Ed.2d 186 (1984). The State did not argue that abstention was appropriate until after it initiated criminal proceedings against several Band members three years after this complaint was filed. During those three years the Band and the State engaged in extensive settlement discussions and massive discovery. The court has also ruled on numerous motions, including six for intervention. Considerations of judicial economy and equity counsel against *Younger* abstention because of the length and complexity of proceedings in this action. *Id.* at 238, 104 S.Ct. at 2328. The State's motion for summary judgment on this issue should be denied.

### III.

The Band's second motion for partial summary judgment seeks judgment in its favor on the res judicata and collateral estoppel defenses asserted by the State, Counties, and Landowners. These defendants contend that the Band's claims are barred by prior proceedings before the Indian Claims Commission (ICC) or the Court of Claims.

### A.

Indian tribes had no forum for their claims against the United States until 1946 when the Indian Claims Commission Act (ICCA) was passed. Before then, Indian tribes had to petition Congress for special jurisdictional acts authorizing the Court of Claims to hear their grievances against the United States. *See generally* Felix S. Cohen, *Handbook on Federal Indian Law* 563 (2d ed. 1982).

In 1946, Congress passed the ICCA (repealed, but previously codified at 25 U.S.C. §§ 70–70w) which created the ICC as a forum for Indian claims against the United States. The ICC had jurisdiction to adjudicate claims against the United States accruing before August 13, 1946, and arising under the Constitution, laws, treaties, or executive orders. ICCA §§ 1, 2. The ICC could also hear claims which "would result if the treaties ... between the claimant and the United States were revised on the ground of fraud, duress, [or] unconscionable consideration ..." as well as those "based upon fair and honorable dealings that are not recognized by any existing rule of law or equity." ICCA §§ 1, 2.

The ICCA had two purposes: " 'To dispose of the Indian claims problem with finality' " and "to transfer from Congress to the [ICC] the responsibility for determining the merits of native American claims." *United States v. Dann,* 470 U.S. 39, 45, 105 S.Ct. 1058, 1062, 84 L.Ed.2d 28 (1985) (quoting H.R.Rep. No. 1466, 79th Cong., 1st Sess., 10 (1945)). The remedies available under the ICCA were exclusive and the district courts were deprived

of subject matter jurisdiction. *Oglala Sioux Tribe v. United States,* 650 F.2d 140, 142–43 (8th Cir.1981), cert. denied, 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982).

On January 2, 1948, several Chippewa tribes and bands filed a petition before the ICC. The Minnesota Chippewa Tribe was a plaintiff, but the Mille Lacs Band was not a party to the suit. The ICC assigned the Chippewa petition to Docket No. 18.

The petition stated that "there was reserved by the claimants, and the defendant undertook to conserve the same, hunting, fishing and other rights in various lands, all of which were a material consideration for ceding said lands." January 2, 1948 ICC Petition at 4. The Chippewa also alleged that the United States "procured the execution of said treaties by misrepresentation and fraud." *Id.* at 10. One of the examples of the fraud was "promises to permit them to continue to hunt and fish in ceded territory." *Id.* The petition also stated "[t]hat treaties were made with the Indians for the purposes of establishing friendship and for civilization and acquiring cessions of land from the Indians and a release of rights thereto." *Id.* at 11. The petition also stated:

[T]he United States has deprived the plaintiffs and other Indians of the right to hunt and fish upon the ceded lands and upon the land retained by them, and has failed to protect them in the quiet enjoyment of the area retained under the Treaty of 1795. On the contrary, the defendant has, by the exercise of force and undue influence, and the withholding of payments of annuities and benefits under treaties, demanded cession of their lands and has terminated the rights to hunt and fish, save upon a few reservations....

*Id.* at 14. The Petition included several paragraphs focusing on the 1837 Treaty, but none of those paragraphs include a reference to hunting and fishing. *Id.* at 21–22.

The ICC divided the claims by treaty area and gave each a separate letter within Docket 18. The 1837 Treaty area and several other treaty areas were assigned to Docket 18C. The 1855 Treaty, which conveyed lands north and northwest of the 1837 ceded territory, was assigned to Docket 18B.

On August 9, 1949, the Minnesota Chippewa Tribe and many Chippewa bands located in Minnesota, Wisconsin, and Michigan filed a lengthy complaint seeking damages "based upon cessions of land at less than true value by reason of fraud and overreaching by the defendant." August 9, 1949 Docket 18C Complaint at 17–18. The cessions were from treaties signed in 1837, 1842, 1847, and 1854. The complaint alleged that "there was reserved for the various parties to said treaties, and the defendant [United States] undertook to conserve the same, hunting, fishing and other rights in various lands, all of which were a material consideration for the ceding thereof." *Id.* at 7. Paragraph 17 alleged that the United States had procured the execution of the treaties by misrepresentation and fraud including its promise to allow them to continue to hunt and fish in the ceded territory. *Id.* at 11. The basis for the hunting and fishing rights was not provided. In the United States' answer to the complaint, it admitted that the treaties reserved hunting and fishing rights, but denied that it had violated the rights in any way. Answer, filed Nov. 3, 1949 at 4. It also denied that it became a conservator or guarantor of the rights of hunting and fishing the ceded lands. *Id.* The United States also generally denied allegations based on fraud and misrepresentation. *Id.*

On October 23, 1957, the ICC issued an order severing the causes of action arising out of the four treaties in Docket 18C. Only the claims under the 1837 Treaty remained in Docket 18C. The ICC then required plaintiffs to file a new complaint in Docket 18C asserting only their claims under the 1837 Treaty. The order provided that the amended complaint "shall be considered as having been filed on August 9, 1949, and shall take the place of said original petition."

On August 5, 1959, the plaintiffs, including the Mille Lacs Band, filed an amended complaint asserting their claims arising out of the 1837 Treaty in Docket 18C. The amended complaint alleged that the $870,000 paid by the United States for the ceded land was "grossly inadequate and unconscionable." August 5, 1959 Complaint in Docket 18C at 3.

It also alleged that "under duress and upon promise that they would be permitted to continue their use and occupation of the ceded lands the Indians signed the treaty of cession presented to them by defendant's agents." *Id.* The complaint sought "an amount which will provide fair and just compensation for the cession." *Id.* at 4. It did not specifically refer to any hunting or fishing rights.

The ICC adjudication of the final claims in Docket 18C took several decades. The ICC first found that Congress recognized title in the Chippewa to all of the 1837 ceded lands when it ratified the 1825 Treaty of Prairie du Chien. 19 Ind.Cl.Comm. 514, 529 (1968). It concluded that the Chippewa were owners by recognized title of the 1837 ceded territory. *Id.*

The ICC then determined the amount of land in the ceded territory and the value of that land in 1837. 26 Ind.Cl.Comm. 22, 32 (1971). It found that there were 13,664,871 acres in the 1837 ceded territory and that 13,302,190 acres were dry land. *Id.* at 39. The Chippewa's expert "valued the subject [dry] land for its two highest and most valuable uses, [white pine] timber and agriculture." *Id.* at 27. The ICC found a fair market value of $9,875,000 when the treaty was proclaimed in 1838. *Id.* at 32. The ICC held that the $870,000 consideration in the treaty was unconscionable considering the fair market value of the lands ceded. *Id.* at 33. The ICC deducted $847,440 in offsetting payment made by the United States and entered final judgment for the Chippewa in the amount of $9,027,560 in full satisfaction of the claims. 32 Ind.Cl.Comm. 192, 200 (1973). None of the ICC opinions or findings of fact in Docket 18C mention the hunting, fishing, and gathering rights reserved under Article V of the 1837 Treaty.

After Docket 18 was divided into several individual dockets, the Chippewa located in Minnesota, including the Mille Lacs Band, filed a complaint arising out of the 1855 Treaty in Docket 18B seeking damages "based upon cessions of land at less than true value by reason of the frauds and overreaching by the defendant." The cessions referred to occurred under treaties signed in 1855, 1863, 1864, and 1867. The Chippewa sought the reasonable and fair value of specific lands ceded under the first clause of Article I of the 1855 Treaty. These lands lie north and northwest of the westernmost lands ceded in 1837. The petition included an allegation that the United States "procured the execution of said treaties by misrepresentation and fraud: ... (e) By promises to permit them to continue to hunt and fish in ceded territory." *Id.* at 11.

The ICC spent several years adjudicating these claims. It initially found that the Chippewa had title to the 1855 ceded territory except for two tracts. 8 Ind.Cl.Comm. 781, 828–29 (1960). The Chippewa appealed the exclusion of the two tracts and the Court of Claims reversed. *Minnesota Chippewa Tribe v. United States,* 161 Ct.Cl. 258, 315 F.2d 906 (1963). On remand, the ICC found that pine timber was the only valuable asset in the ceded lands as of 1855, that its value was $5,628,535, and that the amount paid under the 1855 Treaty was unconscionably low. 14 Ind.Cl.Comm. 226, 248–49, 281, 302–03 (1964). The Chippewa were awarded the difference between the consideration paid for the land and its fair market value, less any gratuitous offsets. *Id.* at 325–27. Neither the ICC nor the Court of Claims opinions, decisions, and findings of fact in Docket 18B discussed whether the 1855 Treaty extinguished the 1837 Treaty usufructuary rights.

Before the ICC was established, Congress passed a special jurisdictional act allowing the "Chippewa Tribe or Bands of Indians of Wisconsin" to sue in the Court of Claims for "all claims of whatsoever nature against the United States." Wisconsin Chippewa Jurisdictional Act, 49 Stat. 1049 (Aug. 30, 1935). On April 1, 1940, several bands of Chippewa Indians filed a petition before the Court of Claims under the special jurisdictional act. Neither the Mille Lacs Band nor the State of Minnesota were parties to this petition. It was filed "to determine all rights and claims of plaintiffs arising out of the treaties, agreements, rules, proclamations, rulings and Acts of Congress affecting lands and other rights of plaintiffs." Court of Claims Petition at 14. The petition became the basis for the decision in *Mole Lake Band of Chippewa, et al.*

*v. United States,* 134 Ct.Cl. 478, 139 F.Supp. 938 (1956), *cert. denied,* 352 U.S. 892, 77 S.Ct. 130, 1 L.Ed.2d 86 (1956).

Several of the claims in the petition allege that federal officials had violated usufructuary rights. For example, the petition alleged:

That by opening the ceded lands to settlement under the General Land Laws of the United States and admitting citizens to the use and occupation thereof, and by permitting the removal of timber the natural habitat of fish, game and fur bearing animals was destroyed, the defendant deprived plaintiffs of a great part of the consideration upon which such cessions were made....

*Court of Claims Petition* at 37. *See also, id.* at 41–43, 47–49, 53, 55–56. The General Accounting Office prepared a report in response to the petition. That report stated that loss of hunting and fishing rights was one of the claims. State's Exhibit 15 at Mn 0000007.

In 1953, the Court of Claims found that all of the claims contained in the original petition were abandoned except claims then pending before the ICC, claims relating to swamp and school lands tried in separate proceedings before the Court of Claims, and seven miscellaneous claims listed in finding of fact 7(b) of the court's decision. *Mole Lake v. United States,* 126 Ct.Cl. 596, 601 (1953). Claims relating to hunting and fishing rights were not adjudicated in either the swamp or school land cases. *See Mole Lake v. United States,* 113 Ct.Cl. 16, 82 F.Supp. 342 (1949) (school land case); *Mole Lake v. United States,* 134 Ct.Cl. 478, 139 F.Supp. 938 (1956) (swamp land case). Claims relating to hunting and fishing rights were also not included in the seven miscellaneous claims listed in finding of fact 7(b). 126 Ct.Cl. at 601.

The petition also alleged that when the United States created reservations in the 1837 and 1842 ceded territories, it conveyed swamp lands to the Indians that had already been conveyed to the State of Wisconsin under the 1850 Swamp Lands Act. Court of Claims Petition at 44. The State of Wisconsin intervened as a plaintiff to support its

claims to the swamp land. *Mole Lake,* 139 F.Supp. 938, 940. The United States argued that it conveyed the lands to the Indians as promised and that it did not grant the lands to Wisconsin. *Id.* It asserted that it could not have granted title to Wisconsin under the Swamp Lands Act because it did not have title of the ceded territory until after the Chippewa were no longer living on the ceded lands. *Id.* According to the United States, the 1850 Removal Order was never carried out and did not disturb Chippewa occupancy. Defendant's Objection to Findings of Fact, March 1, 1954 at 20–21. The plaintiff bands argued that their right of occupancy was terminated by the 1850 Executive Order. May 25, 1948 Plaintiffs' Brief at 9; *see also id.* at 7.

The Court of Claims did not resolve the dispute over the effect of the 1850 Removal Order on Chippewa occupancy. *Mole Lake,* 139 F.Supp. at 940. It found that the 1837 and 1842 Treaties conveyed title to the swamp land regardless of whether the Chippewa occupied the lands. *Id.* at 940. The court then determined that the question of ownership of the lands was immaterial to the ultimate issue of whether the United States breached its promise in the 1854 Treaty to convey the lands. *Id.* at 941. The Court of Claims found that the parties to the 1837 Treaty intended for the Indians to relinquish their rights of occupancy to the lands ceded by the treaty and that the 1850 Executive Order was intended to terminate the temporary rights of occupancy of the ceded lands granted by the 1837 and 1842 Treaties. Findings of Fact at 118. The Court found:

119. (a) By the Treaty of July 29, 1837, the parties intended for the Indians (1) to relinquish their ancient right of occupancy of the lands ceded by the treaty and (2) to convey to the United States the Indian title to such lands.... (c) The Executive order of February 6, 1850, was intended to terminate the temporary rights of occupancy of the ceded lands granted by the treaties named in subparagraph[ ] (a) ... above.

*Id.*

### B.

Collateral estoppel bars a party from relitigating an issue that was "actually

litigated and necessary to the outcome" of a prior adjudication. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326, n. 5, 99 S.Ct. 645, 649, n. 5, 58 L.Ed.2d 552 (1979). To apply the principle of collateral estoppel to a factual issue the party relying on the previous judgment must show that 1) the issue in the present action is identical to one in the prior action, 2) the estopped party was a party or in privity with a party to the prior adjudication, 3) the prior action resulted in a final adjudication on the merits, and 4) the party sought to be estopped was given a full and fair opportunity to be heard on the issue in the prior action. *Wellons, Inc. v. T.E. Ibberson Co.,* 869 F.2d 1166, 1169 (8th Cir.1989). The entire record of the earlier proceeding should be considered in determining whether an issue was actually litigated and necessary to the decision. *In re Miera,* 926 F.2d 741, 743 (8th Cir.1991).

## C.

■ The Landowners argue that the *Mole Lake* litigation precludes the Band's claims in this action. They assert that the Band was in privity with the *Mole Lake* plaintiffs and that there is a privity relationship among all Bands who signed the 1837 Treaty. The Band responds that it was not a party to the *Mole Lake* proceedings and that it could not have had a full and fair opportunity to litigate any issue in that proceedings.

"A person is in 'functional privity' with a party and is thus collaterally estopped where he has participated in the prior fair and adequate litigation of the issue sought to be relitigated." *Oglala Sioux Tribe v. Homestake Mining Co.,* 722 F.2d 1407, 1414, n. 7 (8th Cir.1983). "Privity does not exist merely because parties happen to be interested in the same question, or in proving or disproving the same state of facts." *Headley v. Bacon,* 828 F.2d 1272, 1275 (8th Cir.1987). The Band was not a party to the *Mole Lake* litigation and was not in privity with other tribes merely based upon the fact that the 1837 Treaty bears all of their signatures.

Even if the Band were in privity with the plaintiffs in *Mole Lake,* the Band's claims here would still not be barred. The *Mole Lake* litigation discussed the historical context of the 1850 Removal Order, but did not determine whether it was valid. *Lac Courte Oreilles Band, et al. v. Voigt,* 700 F.2d 341, 360 (7th Cir.1983), *cert. denied,* 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983). The *Mole Lake* decisions did not determine whether the Band retained usufructuary rights under the 1837 Treaty. The issues are therefore not identical and should not be barred.

## D.

■ The Band argues that the proceedings in ICC dockets 18B and 18C also do not bar its current claims. It asserts that the lack of discussion, argument, or findings related to usufructuary rights indicate that these rights were not decided. It contends that if the ICC had awarded compensation for usufructuary rights, then it would have made findings that those rights had been extinguished. It maintains that the payment of an ICC claim for taking of land does not establish that reserved usufructuary rights had also been taken.

The State responds that the claims abandoned in the *Mole Lake* proceedings, including claims arising out of the usufructuary rights, were carried over to the ICC.[5] It asserts that the ICC must have implicitly decided that the usufructuary rights were extinguished or it could not have awarded compensation for the ceded lands based upon their highest and best uses. It contends that the absence of findings on usufructuary rights is inconclusive because the highest and best use valuation necessarily encompassed those claims.

The Landowners also argue that the Band's claims are barred by the ICC proceeding under the doctrines of collateral estoppel and res judicata because the highest and best use value included the Article V rights. They argue that if the Article V rights had not been adjudicated by the ICC,

---

5. The State has abandoned its res judicata defense because the parties here are not identical to

those in the ICC proceedings.

then the value of these rights would have been subtracted from the highest and best use figure.

The Counties argue that if the Band believed it retained Article V privileges, then it should have raised that issue before the ICC.

The Band replies that any claims in *Mole Lake* seeking compensation for lost hunting and fishing rights were abandoned by the plaintiffs and never actually litigated. It asserts that these abandoned claims could not have been transferred to the ICC because transfer of Court of Claims suits was prohibited by the ICCA. 25 U.S.C. § 70j. It argues that the only ICC complaints relevant to this action are the final complaints filed in dockets 18B and 18C which do not include any reference to lost hunting and fishing privileges. Even if the earlier complaints are considered, the Band contends that the vague allegations about hunting and fishing rights do not state a claim about usufructuary rights under the 1837 Treaty.

The pleadings and record should be examined to determine whether an issue was actually litigated and necessary to the outcome of a case. *Nelson v. Swing–A–Way*, 266 F.2d 184, 187 (8th Cir.1959). The initial pleadings filed in Docket 18 and then in Docket 18C were completely superseded by the complaints finally filed in those dockets. The final complaint in Docket 18C does not contain any reference to hunting, fishing, and gathering rights. The final complaint in Docket 18B does not refer to any hunting, fishing, and gathering privileges guaranteed under the 1837 Treaty. The record is also devoid of any findings or conclusions about the 1837 Treaty usufructuary rights. Claims in the *Mole Lake* proceedings that had been abandoned could not have been automatically incorporated in the ICC pleadings, and those claims that were still pending before the Court of Claims could not have been transferred to the ICC. 25 U.S.C. § 70j. The final pleadings and the record indicate that the issue of whether the usufructuary rights had been extinguished was not litigated before the ICC.

In any event, the earlier complaints themselves indicate that the validity of the usufructuary rights was not litigated before the ICC. The only reference to hunting and fishing rights in the earlier complaints are vague allegations that the United States had not honored its promises to allow the Indians to continue to hunt and fish in the ceded territory. These allegations do not identify which of the treaties included in the complaint provide the basis for the promises. They do not refer to the gathering privileges also retained in the 1837 Treaty. The allegations appear to focus on the failure of the United States to protect the exercise of the rights Indians from outside interference.

The ICC's award of compensation for the lands ceded under the 1837 Treaty based upon their highest and best valuation does not indicate that the ICC concluded that the usufructuary rights had been extinguished. The ICC did not have "jurisdiction to extinguish title on its own authority; it simply had jurisdiction to award damages for takings or other wrongs that occurred on or before August 13, 1946." *United States v. Dann*, 873 F.2d 1189, 1198 (9th Cir.1989).

The ICC award compensated the Band for land ceded under the 1837 Treaty. The 1837 Treaty expressly retained hunting, fishing, and gathering rights. If the ICC had been awarding compensation for the reserved rights, it would have had to make a finding that they were extinguished. The ICC did not make any finding about the usufructuary rights, and there is no reason to believe that their value was included in the award.

Defendants rely on *Oregon Dep't of Fish and Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 766, 105 S.Ct. 3420, 3428, 87 L.Ed.2d 542 (1985). They argue that *Klamath* concluded that the lack of a specific finding by the ICC on the value of hunting and fishing rights did not necessarily mean that those rights were not included in a later compensation for the highest and best use of the land. This case does not lead to the conclusion that the Band's claims here should be barred by the proceedings before the ICC, however.

In *Klamath*, the plaintiff tribe ceded all of its right, title and claim to its claimed lands in an 1864 treaty, but reserved a 1.9 million acre reservation. The treaty gave the tribe

"the exclusive right of taking fish in the streams and lakes, included in said reservation, and of gathering edible roots, seeds, and berries within its limits." *Id.* at 755, 105 S.Ct. at 3422. No right to hunt or fish outside the reservation was reserved. *Id.* A large portion of the reservation was excluded as a result of a survey error. *Id.* at 757, 105 S.Ct. at 3423. In 1901 the tribe agreed to "cede, surrender, grant, and convey to the United States all their claim, right, title and interest in and to" the land mistakenly excluded in exchange for monetary compensation. *Id.* at 760, 105 S.Ct. at 3425.

The 1901 agreement in *Klamath* did not contain any reference to hunting and fishing rights, but it stated that "nothing in this agreement shall be construed to deprive [the tribe] of any benefits to which they are entitled under existing treaties not inconsistent with the provisions of this agreement." *Id.* at 761, 105 S.Ct. at 3425. After the state of Oregon enforced its conservation laws against the tribe on the lands ceded in 1901, the tribe sued the state. *Id.* at 762, 105 S.Ct. at 3425–26. The tribe argued that the Indians would not have understood that the 1901 agreement abrogated their hunting and fishing rights.

When the case reached the Supreme Court, it reversed the lower court rulings in favor of the tribe. The Court acknowledged that ambiguities should be resolved in the favor of Indians and that the language of a treaty should be viewed in its historical context, but it concluded that the language of the 1901 agreement forfeiting all of "the tribe's claim, right, title and interest in and to" the misappropriated land included the usufructuary rights for reservation lands that were previously reserved.

Unlike the agreement in *Klamath,* the 1837 Treaty at issue in this case explicitly gave usufructuary rights to the Band. Whether those rights continue to exist was not an issue decided by the ICC. The decision in *Klamath* turned on a different historical background, and it is not controlling here. Plaintiffs' motion for summary judgment on the collateral estoppel defense should be granted.[6]

## IV.

[redacted] The Band's third motion for partial summary judgment seeks judgment on the defense asserted by the State defendants and the defendant-intervenors that the Indian Claims Commission Act (ICCA) bars this action because it was an exclusive remedy and the ICCA statute of limitations has run. The State defendants do not respond to the Band's arguments. The Landowners and Counties oppose the Band's motion.[7]

The ICCA was passed to provide a process to adjudicate Indian claims against the United States with finality. Felix S. Cohen, *Handbook of Federal Indian Law* (2d ed. 1982). The ICC had jurisdiction to consider claims against the United States which accrued before August 13, 1946, and were filed before August 13, 1951. 25 U.S.C. § 70a. If a claim that had accrued before August 13, 1946 was not filed by August 13, 1951, then it could not "thereafter be submitted to any court or administrative agency for consideration." 25 U.S.C. § 70k.

The Landowners and Counties argue that the 1850 Executive Order and 1855 Treaty extinguished any usufructuary rights that the Band retained under the 1837 Treaty. They contend that the Band had to bring any claim for these rights to the ICC before August 13, 1951. They emphasize that Congress intended for the ICCA to bring finality to the Indian claims process.

The Band responds that its claims arise from current violations of its treaty rights

6. The collateral estoppel defense asserted by the State defendants is also undercut by their earlier admission that they "do not contend that the Band's current litigation is precluded." Answer to Interrogatory No. 33.

7. The Band also seeks judgment on the defense that the case should be dismissed because the United States is an indispensable party. The State acknowledges that this issue is now moot, and the Counties do not address it. The Landowners argue the issue is not moot because they believe the United States should be acting as a defendant to protect the interests of its citizens who obtained patents from it. Since the United States is a plaintiff-intervenor, the defense that it was an indispensable party that had not been joined is moot.

and that these claims could not have been brought before the ICC because they had not yet occurred. The Band notes that its current claims are based on its position that its usufructuary rights were never extinguished. It argues that the ICC could not have heard these claims because its jurisdiction was limited to providing compensation for extinguished title. The Band argues that the ICC also did not have jurisdiction to hear its current claims because non-monetary relief is sought and they are asserted against parties other than the United States.

The ICC did not have "jurisdiction to extinguish title on its own authority; it simply had jurisdiction to award damages for takings or other wrongs that occurred on or before August 13, 1946." *United States v. Dann*, 873 F.2d 1189, 1198 (9th Cir.1989). The Band's claims in this action are based on its position that its usufructuary rights were never extinguished. The ICC would have dismissed any claim relying on existing rights for lack of jurisdiction. Moreover, the Band's claims for present violations of those rights did not accrue until long after August 13, 1946, and the ICC would not have had jurisdiction over them. The ICC also could not hear the Band's claims because it was limited to adjudicating claims against the United States, and the Band is seeking relief against State defendants. *Sokaogon Chippewa Community v. Wisconsin*, 879 F.2d 300, 302 (7th Cir.1989). The Band's motion for summary judgment should be granted.

### V.

The State has in turn filed a motion for summary judgment on the merits of the Band's claims. The Landowners and Counties support the motion.

The State, Landowners, and Counties argue that they are entitled to summary judgment that the Band's usufructuary rights were extinguished by President Taylor's 1850 Executive Order or, in the alternative, by the 1855 Treaty between the United States and the Chippewa Indians.

### A.

After the Northwest Ordinance was adopted in 1787, the United States began to negotiate treaties with the Indians. The Northwest Ordinance required that "the utmost good faith" always be observed toward the Indians and that their lands and property never be taken without their consent. The Northwest Ordinance, I Stat. 51 (July 13, 1787).

According to the State, in the early nineteenth century both Congress and the Executive branch began to favor a policy of removing Indians from their lands and reestablishing them west of the Mississippi River. On May 28, 1830, Congress authorized the President to convey lands west of the Mississippi to "such tribes or nations of Indians as may choose to exchange the lands where they now reside, and remove there." Removal Act, IV Stat. 411 (May 28, 1830). The 1830 Removal Act also provided that "nothing in this act contained shall be construed as authorizing or directing the violation of any existing treaty between the United States and any of the Indian tribes." *Id.*

In 1837 Congress passed a general appropriations act for the Indian Department. That appropriations act provided $10,000 "[f]or holding treaties with the various tribes of Indians east of the Mississippi river, for the cession of lands held by them respectively, and for their removal west of the Mississippi." Plaintiffs' Exhibit P–0044. Congress also appropriated money to determine whether the vacant lands west of the Mississippi would be adequate for the Indians who remained east of the Mississippi. *Id.*

The Chippewa met with Wisconsin Territorial Governor Henry Dodge from July 20 to July 29, 1837. At the first session, Dodge explained why the President had sent him:

> Your Great Father The President of the United States has sent me to see you in Council, to propose to you the purchase of a small part of your country East of the Mississippi River. The country, as I am informed, is not valuable to you for its game, and not suited to the culture of corn, and other Agricultural purposes. Your Great Father wishes to purchase your country on the Chippewa and St. Croix Rivers, for the advantage of its pine timber, with which it is said to abound.

1837 Treaty Journal at 131. The Band has presented additional evidence that the United States wanted to purchase the Chippewa lands for timber and that removal was not discussed during the treaty negotiations. One of its experts, Professor Charles E. Cleland, states, "There was no discussion whatsoever during the negotiation of the treaty and nothing in the treaty itself which implies removal." Cleland Report at 39.

The Chippewa agreed to sell their land, but repeatedly emphasized that they wanted to retain their hunting, fishing, and gathering rights. For example, Ma-ghe-ga-bo, one of two spokesmen for the Chippewa, stated:

> I stand here to represent the Chiefs of the different bands of my nation assembled here, & to tell you of their determination, to sell you the lands that you want of them. My Father, Listen to me. *Of all the country that we grant you we wish to hold on to a tree where we get our living, & to reserve the streams where we drink the waters that give us life.*\* .... The Chiefs will now show you the tree we want to reserve. This is it (placing an oak sprig upon the Table near the map). It is a different kind of tree from the one you wish to get from us.

> ___
> \* This of course is nonsense—but is given *literally* as rendered by the Interpreters, who are unfit to act in that capacity. I *presume* it to mean that the Indians wish to reserve the privilege of hunting & fishing on the lands and making sugar from the Maple.

1837 Treaty Journal at 142 (emphasis in original).

When Dodge asked the Indians to state their price, Ma-ghe-ga-bo suggested a sixty year annuity and stated, "If I have rightly understood you, we can remain on the lands and hunt there. We have heretofore got our living on them." *Id.* at 143. Dodge again asked for the price, but the Chippewa indicated that they would provide an answer the next day after consulting with others. *Id.* at 144. Before the Chippewa departed, Dodge stated:

> that your Great Father, never buys land for a term of years. I will agree on the part of the President, that you shall have the free use of the rivers, and the privilege of hunting upon the lands you are to sell to the United States, during his pleasure.

*Id.* Dodge also stated that it was his wish, "as well as that of your Great Father in Washington, that [the Sub-agents] shall do you justice." *Id.*

On July 28, 1837, Flat Mouth spoke for the Chippewa. He stated:

> My Father. Your children are willing to let you have their lands, but they wish to reserve the privilege of making sugar from the trees, and getting their living from the Lakes and Rivers, as they have done heretofore, and of remaining in this Country.... You know we can not live, deprived of our Lakes and Rivers; There is some game on the lands yet; & for that reason also, we wish to remain upon them, to get a living.

*Id.* at 145. Dodge responded:

> My Friends. I have listened with great attention, to your Chief, from Leech Lake. I will make known to your Great Father, your request to be permitted to make sugar, on the lands; and you will be allowed, during his pleasure, to hunt and fish on them. It will probably be many years, before your Great Father will want all these lands for the use of his white Children.

*Id.* at 146. During the negotiations of the price Dodge said. "[i]t is my duty in the relation in which I stand to you, to see justice done to you, and so far as it is in my power, I will do it in all things." *Id.* at 150.

Dodge and representatives of twelve Chippewa bands, including the Mille Lacs Band, executed the Treaty with the Chippewa of 1837 (the 1837 Treaty) on July 29, 1837. 7 Stat. 536. The Treaty stated:

> Article 1. The said Chippewa nation cede to the United States all that tract of country included within the following boundaries: ....

> Article 2. In consideration of the cession aforesaid, the United States agrees to make the Chippewa nation ... the following payments....

> Article 5. The privilege of hunting, fishing, and gathering the wild rice, upon the lands, the rivers and the lakes included in

the territory ceded, is guaranteed to the Indians, during the pleasure of the President of the United States....

When the council closed Dodge stated, "I will recommend you to your Great Father the President, as a good people, who deserve the confidence and friendship of Our Government." *Id.* at 146. The 1837 Treaty was ratified by Congress.

On February 6, 1850, President Zachary Taylor issued the following Executive Order:

The privileges granted temporarily to the Chippewa Indians of the Mississippi by the fifth article of the treaty made with them on the 29th of July 1837 "of hunting, fishing and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded" by that treaty to the United States ... are hereby revoked; and all of the said Indians remaining on the land ceded aforesaid, are required to remove to their unceded lands.

The Band has presented evidence that the removal order was issued to provide political patronage to Minnesota politicians and businessmen who were annoyed that the Chippewa spent their annuities in Wisconsin instead of Minnesota. According to the Band, Minnesota businessmen convinced President Taylor to issue the 1850 Executive Order to move the Wisconsin Chippewa to Minnesota to expand Minnesota's economy.

The Band has presented evidence that no one believed that the 1850 order applied to the Band and that in 1855 Territorial Governor Willis Gorman, federal officials, local citizens, and the Chippewa all believed that the Band retained hunting, fishing, and gathering rights under the 1837 Treaty. The Band has also presented evidence that removal of Indians from the 1837 ceded territory was unnecessary in 1850 because there were so few white settlers in the area. Finally, the Band has presented evidence that the Chippewa had not committed any wrongful acts requiring revocation of their usufructuary rights.

On August 25, 1851, removal of the Chippewa Indians was suspended. Despite the suspension of the removal order, a federal agent in Minnesota continued to enforce it.

Most of the Chippewa refused to move, and the agent suspended their annuities as punishment. In 1853, the Pierce administration reversed the policy of only paying annuities to Chippewa who complied with the 1850 Order. According to the Band, President Pierce repealed the 1850 Executive Order in 1854, but there is no Executive Order actually repealing the 1850 order. The Band relies on evidence that the Commissioner of Indian Affairs repealed the order. At least one of its experts concludes that the removal order was completely revoked.

On December 19, 1854, Congress authorized the President "to cause negotiations to be entered into with the Chippewa Indians, for the extinguishment of their title to all the lands owned and claimed by them in the Territory of Minnesota and State of Wisconsin." 10 Stat. 598. The Act indicated that reservations should be established for the Indians and that "the Laws of United States and the Territory of Minnesota shall be extended over the Chippewa territory in Minnesota whenever the same may be ceded, and the same shall cease to be Indian Country." *Id.*

In early 1855, the Mississippi, Pilleger, and Lake Winnibigoshish Band of Chippewa entered into negotiations with Commissioner of Indian Affairs George Manypenny. They eventually entered a treaty. The first sentence of Article I of the 1855 Treaty states:

The Mississippi, Pillager and Lake Winnibigoshish band of Chippewa Indians hereby cede, sell, and convey to the United States all their right, title and interest in, and to, the lands now owned and claimed by them, in the Territory of Minnesota, and included within the following boundaries....

10 Stat. 1165. The area described is north and northwest of the 1837 ceded territory. The second sentence in Article I states:

And the same Indians do further fully and entirely relinquish and convey to the United States any and all right, title or interest, of whatsoever nature the same may be, which they may now have in, and to, any other lands in the Territory of Minnesota or elsewhere.

The Chippewa also agreed to:

settle down in the peaceful pursuits of life, commence the cultivation of the soil, and appropriate their means to the erection of houses, opening farms, the education of their children, and such other objects of improvement and convenience, as are incident to well-regulated society.

*Id.* at art. IX.

**B.**

 The State argues that the 1850 Executive Order expressly terminated the Band's usufructuary rights under the 1837 Treaty. It asserts that President Taylor had the authority to issue the order.

The Band responds that the 1850 Executive Order has no legal effect because it was unauthorized, violated applicable law, and was repealed by later orders and treaties. It asserts that the Indians' understanding of the 1837 Treaty must be considered. It argues that the proper analysis of the 1837 Treaty indicates that the President did not have unfettered discretion to revoke usufructuary rights. It contends that the 1850 order violated the 1837 Treaty and the President's duty of good faith to the Chippewa Indians.

The United States supports the Band's position. It contends that the historical context of the 1837 Treaty must be thoroughly examined before the nature and extent of the claimed rights can be defined.

The Landowners argue that the court must examine only the plain meaning of the 1850 order. According to the Landowners, the 1850 order was not ambiguous, and no further inquiry is needed. If further inquiry were necessary, however, the Landowners argue that the only appropriate historical source is contemporaneous legislative history.

The Counties argue that the 1850 order was supported by the 1837 appropriations act which indicates an intent to give the President broad discretion over Indian affairs. It contends that the order was also supported by the plain language of the 1837 Treaty.

The State replies that the 1850 order was authorized by Congress and is entitled to deference. It asserts that the President's authority to act could not have been limited

by the Chippewa understanding of the 1837 Treaty. It contends that the failure of the removal effort does not affect the order's validity.

"The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585, 72 S.Ct. 863, 866, 96 L.Ed. 1153 (1952). The Court has recognized that the three categories developed by Justice Jackson in his concurring opinion in *Youngstown Sheet & Tube* are analytically useful. *Dames & Moore v. Regan,* 453 U.S. 654, 668–69, 101 S.Ct. 2972, 2980–81, 69 L.Ed.2d 918 (1981).

Justice Jackson explained that when the President acts pursuant to an express or implied authorization of Congress, the executive action "would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." *Youngstown Sheet & Tube,* 343 U.S. at 637, 72 S.Ct. at 871. If the President acts without congressional authorization, then he may enter "a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain." *Id.* It that case, the court must consider any information that might illuminate Congressional views on the subject including "congressional inertia, indifference or quiescence." *Id.* If the President's action is opposed to Congressional will, his action can be sustained "only by disabling the Congress from acting upon the subject." *Id.* at 637–38, 72 S.Ct. at 871.

It is clear that the Constitution did not provide President Taylor with the power to revoke treaty rights. Under the Constitution, Congress has plenary authority over Indian affairs. *Lac Courte Oreilles Band v. Voigt,* 700 F.2d 341, 361–62 (7th Cir.), *cert. denied,* 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983) (LCO).

The court has carefully reviewed the Congressional actions that the State argues support the 1850 Executive Order. Viewing the facts in the light most favorable to the Band, the State has not shown that it is entitled to

judgment as a matter of law that Congressional action during the early nineteenth century provided President Taylor with authority to revoke treaty rights.

■ The State has also not shown that it entitled to judgment as a matter of law that the 1837 Treaty gave the President the power to revoke the usufructuary rights. Indian treaties must be construed as the Indians understood them. *LCO* at 350. In addition, ambiguous words and phrases in Indian treaties should be resolved in favor of the Indians. *Id.* A liberal interpretation in favor of the Indians is appropriate. *Id.* at 351. The history of the treaty, the negotiations, and the parties' practical construction are all relevant to the interpretation. *Id.* at 351.

Viewing the facts in the light most favorable to the Band, the Indians did not understand the term "pleasure of the President" to give the President unfettered discretion to abrogate their usufructuary rights.

### C.

■ The State argues that the 1855 Treaty contained an unqualified transfer of title. It asserts that the transfer included the transfer of hunting and fishing rights.

The Band responds that the treaty must be interpreted in its historical context. It contends that proper interpretation of the historical context indicates that the Band did not believe that the 1855 Treaty abrogated its 1837 Treaty rights, that the negotiations did not include any discussion of the 1837 Treaty rights, and that the Band would not have agreed to abrogation of its 1837 Treaty rights. It contends that the United States would have used more specific language if it had intended to abrogate the 1837 Treaty rights. Moreover, it notes that only Congress can abrogate a right conferred under a treaty.

The Counties and Landowners argue that the plain meaning of the 1855 Treaty abrogated the 1837 usufructuary rights. They

contend that the second sentence of Article I of the 1837 Treaty clearly waives any interest that the Band had in any land in Minnesota. They assert that the parties would have mentioned the usufructuary rights if they intended to preserve them.

The State replies that the court can adequately examine the historical record of the 1855 Treaty without having trial. It contends that the only sensible reading of the second sentence of Article I of the 1855 Treaty [8] is that the Chippewa were giving up every kind of interest in any land in Minnesota, not merely the land described in Article II. The State argues that its failure to enforce conservation laws against the Chippewa is irrelevant.

■ The history of the treaty, the negotiations, and the parties' practical construction are all relevant to the interpretation of an Indian treaty. *LCO* at 351. Viewing the facts in the light most favorable to the Band, the State has not shown that it is entitled to judgment as a matter of law that the 1855 Treaty abrogated the Band's usufructuary rights.

### VI.

The United States moves for the dismissal of the counterclaims that the Landowners have asserted against it for lack of jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6).

### A.

The complaint filed by the United States seeks a declaratory judgment that the Band has retained off-reservation hunting, fishing, and gathering rights on public lands in the territory ceded in the 1837 treaty. It also seeks an injunction to prevent State officials or agents from interfering in hunting, fishing or gathering activities by Band members in the area ceded by the 1837 Treaty or from enforcing any of the State's hunting and fishing laws on the ceded land.

8. That sentence states: "And the same Indians do further fully and entirely relinquish and convey to the United States any and all right, title or interest, of whatsoever nature the same may be,

which they may now have in, and to, any other lands in the Territory of Minnesota or elsewhere."

In their answer to the complaint filed by the United States, the Landowners asserted a number of counterclaims. Counts I, II, and III allege that the Landowners were third party beneficiaries of the 1837 and 1855 treaties and the land grant process. Count IV alleges promissory estoppel on the ground that the United States never revealed that the usufructuary rights continued to exist on public or private lands. Count V alleges breach of contract because the United States breached its implied duty of good faith and fair dealing by not disclosing that the usufructuary rights still exist. Count VI alleges negligence because the United States had a duty to inform the predecessors in title of the Landowners that the usufructuary rights still existed when the land was granted to them. Count VII alleges negligence and breach of implied duty of good faith and fair dealing because the United States should have become a defendant in this suit. Count VII requests a declaratory judgment. The Landowners contend that they are entitled to relief even if the exercise of the rights is limited to public land.

In their answer the Landowners offer no basis for the waiver of the sovereign immunity of the United States. The statutes that they rely on provide federal courts with jurisdiction over certain matters, but do not waive the government's sovereign immunity.

### B.

■ "[A]ny counterclaim in an action brought by the United States must show the authority by which the claim against the United States may be maintained in order for the court to be able to exercise its jurisdiction." *United States v. Shaw*, 309 U.S. 495, 503, 60 S.Ct. 659, 662, 84 L.Ed. 888 (1940). The United States may be sued only to the extent that it has waived its sovereign immunity. *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 769–70, 85 L.Ed. 1058 (1941). Waiver of sovereign immunity must be clearly expressed and must be construed in favor of the sovereign. *United States v. Nordic Villages, Inc.*, — U.S. —, ——, 112 S.Ct. 1011, 1014, 117 L.Ed.2d 181 (1992). Statutes which are merely jurisdictional do not waive sovereign immunity. *See*

*Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 121, 104 S.Ct. 900, 919, 79 L.Ed.2d 67 (1984).

The Landowners concede that they did not allege a sufficient jurisdictional basis in the answer and request permission to amend their pleadings to assert several bases for jurisdiction. The United States argues that none of the these bases are sufficient and that amendment of the answer would therefore be futile.

■ The Landowners assert that the United States waived sovereign immunity for these claims in the Quiet Title Act, 28 U.S.C. § 2409a *et seq.*. They contend that the United States has asserted an interest in their lands by claiming that the Band's usufructuary rights continue to exist on surrounding public property. The Landowners argue that their property values could decrease if the Band were allowed to exercise its rights on surrounding public lands. They maintain that this potential decrease in their property values means that the United States is asserting an interest in their property.

The United States responds that the Quiet Title Act provides a remedy only if there is a dispute over title and the United States claims an interest in the land. It contends that there is no dispute over title in this case and that it is not seeking an interest in property held by the Landowners. It argues that is only seeking a right of access to lands which have been opened to public use.

The Quiet Title Act, 28 U.S.C. § 2409a *et seq.*, allows suits against the United States to quiet title to lands in which the United States has claimed an interest. The Quiet Title Act may apply even if the United States has not asserted full legal title in the land. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 769 (4th Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 1667, 118 L.Ed.2d 388 (1992). "As long as the interest claimed is a 'cloud on title,' or a reasonable claim with a substantial basis, it constitutes a 'claim' for purposes of triggering the twelve-year statute of limitations." *Id.*

The United States has not asserted any interest in the property owned by the Land-

owners. It seeks only a right of access to lands open to public use. The interest claimed by the United States does not constitute a cloud on the Landowners' title to their property and the Quiet Title Act does not apply to their counterclaims.

■ The Landowners also argue that the United States waived sovereign immunity for their counterclaims in the Little Tucker Act. 28 U.S.C. § 1346. They contend that all of their counterclaims are based on contractual law. They assert that they were third party beneficiaries of the 1837 and 1855 treaties with Indian tribes. They contend that the United States is breaching its duties to them by appearing in this suit on the side of the Band. They maintain that they are each seeking less than $10,000 in damages for their contract based claims.

The United States responds that the fundamental nature of the Landowners' counterclaims is tort, not contract. It asserts that the Landowners may not avoid the limitations of the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, by pleading their tort claims as contract claims. Moreover, the United States contends that each of the Landowners seeks more than $10,000 because they are seeking attorney fees as well as damages not to exceed $10,00 on several counterclaims and unspecified damages on other counterclaims. The United States also argues that there is no evidence that the Landowners or their predecessors in title were beneficiaries to the treaties. Finally, the United States asserts that any claims that the Landowners might have had under the Little Tucker Act are barred by the six year statute of limitations.

The Tucker Act provides jurisdiction in the United States Claims Court for claims against the United States founded "upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Little Tucker Act provides concurrent jurisdiction in the district courts and Court of Claims for similar claims not exceeding $10,000 in amount. 28 U.S.C. § 1346(a)(2). Claims of more than $10,000 are within the exclusive jurisdiction of the Court of Claims. 28 U.S.C. § 1346(a)(2), 28 U.S.C. § 1491. Each individual's claim must be less than $10,000, including attorney fees. *Zumerling v. Devine*, 769 F.2d 745, 748 (Fed.Cir.1985). "Litigants cannot manipulate Tucker Act jurisdiction by semantically recasting their claims in language of contract and tort." *Bembenista v. United States*, 866 F.2d 493, 497 (D.C.Cir. 1989).

" 'To entitle one to sue as a third-party beneficiary of a contract to which he is not a party, the contract must reflect the intent not merely to benefit the third-party but also to give him the direct right to compensation or to enforce that right against the promisor.' " *Sharkey v. United States*, 17 Cl.Ct. 643, 652–53 (Ct.Cl.1989). The Landowners point to their expert's report that the treaties paved the way for the land grant process, but the 1837 and 1855 treaties do not mention future landowners at all and do not foresee them as third party beneficiaries. These claims should therefore be dismissed.

The court also does not have jurisdiction over the Landowners' counterclaims under the Little Tucker Act because they seek damages in excess of the jurisdictional limit. The Landowners have asserted damages not to exceed $10,000 for each of the land parcels, but they also seek attorney fees. When the amount of attorney fees and damages sought are aggregated, they could exceed $10,000. The Court of Claims has exclusive jurisdiction over claims of more than $10,000.

■ Finally, the court does not have jurisdiction over the Landowners' counterclaims under the Little Tucker Act because the statute of limitations has run. The fee patents were dated between 1868 and 1914, and any claims under the Little Tucker Act would have been barred six years after the patents were dated. Claims under the treaties were barred six years after their execution.

■ The Landowners also argue that their counterclaims are compulsory and that the court has supplemental jurisdiction over them. They assert that the evidence necessary to prove their counterclaims is substantially the same as the evidence for plaintiffs' claims because both sets arise out of property law, not Indian law. They also contend

that there is a logical relationship between their claims and the plaintiffs' claims.

The United States responds that the Landowners' counterclaims are not compulsory. It asserts that the counterclaims are not part of the same transaction or occurrence as the Band's claims because the latter's claims arise out of Indian law, but the Landowners' claims arise out of contract and property law. Even assuming that the claims arise out of the same events, the United States argues that they require additional legal conclusions and factual evidence to prove and are therefore not compulsory.

A federal court has supplemental jurisdiction over compulsory counterclaims, but permissive counterclaims require an independent jurisdictional basis. *Unique Concepts, Inc. v. Manuel*, 930 F.2d 573, 574 (7th Cir.1991). Rule 13(a) states:

A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

To determine whether a claim arises out of the same transaction or occurrence, the court should consider whether the issues of fact and law raised by the claim and counterclaim are largely the same, whether res judicata would bar a subsequent suit on the defendant's claim, whether the evidence to support or refute the counterclaims would be substantially the same as the plaintiff's claim, and whether there is a logical relation between the claim and counterclaim. *Cochrane v. Iowa Beef Processors*, 596 F.2d 254, 265 (8th Cir.), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979).

The Landowners concede that their claims would not be barred by res judicata. The Band's claims arise out of the 1837 treaty, but the counterclaims asserted by the Landowners arise out of the transfer of land from the United States to private citizens through the patent process. The patent process and the 1837 treaty are distinct events not part of the same transaction or occurrence. More-

over, the law and facts needed to prove the counterclaims asserted by the Landowners will be significantly different from those necessary to the Band's claims. The Band's claims focus on their usufructuary rights under the 1837 treaty and will require conclusions about federal Indian law. The Landowners' counterclaims would require evidence about the land patent process, property law, and contractual law. Although there may be some overlap of issues between the Band's claims and the Landowners' counterclaims, there is not a logical relationship between the treaty process and the eventual transfer of ceded lands to private landowners. The counterclaims require an independent jurisdictional basis.

Even if the counterclaims were compulsory, they should still be dismissed because the Landowners have not shown that the United States has waived its sovereign immunity. Rule 13 "shall not be construed to enlarge beyond the limits now fixed by law the right to assert counterclaims or to claims credits against the United States or an officer or agency thereof." Fed.R.Civ.P. 13(d).

## VII.

All of the pending motions in this case will now have been ruled on, and the remaining issues must be tried. Since this opinion is lengthy, a summary of the issues may be helpful. The Band's motion for partial summary judgment on miscellaneous defenses should be granted on the delay based defenses of statute of limitations on claims for relief directly under the 1837 Treaty, laches, estoppel, waiver, release, and adverse possession and on the governmental and person immunity defenses. It should also be granted on the defenses that the Band and Sando are not persons within the meaning of 42 U.S.C. § 1983, but should be denied in any other respect. The Band's motion for partial summary judgment on the defenses of res judicata and collateral estoppel should also be granted, as should its motion for partial summary judgment on the defenses based on the ICCA. The portion of the motion seeking judgment on the defense of failure to join the United States as a party should be dismissed

as moot. The motions by the State for summary judgment should be denied. The motion by the United States to dismiss the counterclaims asserted by the Landowners should be granted.

## ORDER

Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. The motion for partial summary judgment by plaintiffs on miscellaneous defenses is granted to the extent that it seeks judgment in their favor on the delay based defenses of statute of limitations on their claims for relief directly under the 1837 Treaty, laches, estoppel, waiver, release, and adverse possession; the governmental and personal immunity defenses; and that the Band and the Commissioner of Natural Resources acting in his official capacity are not persons within the meaning of 42 U.S.C. § 1983, and those defenses are stricken. The motion is denied to the extent that it seeks judgment on the defenses of statute of limitations to claims under 42 U.S.C. § 1983 and that the State is not a person within that statute.

2. The motion for partial summary judgment by plaintiffs on the defenses of res judicata and collateral estoppel is granted, and those defenses are stricken.

3. The motion for partial summary judgment by plaintiffs is granted to the extent that they seek judgment on the defenses based on the Indian Claims Commission Act, 60 Stat. 1049, and that defense is stricken; the portion of the motion seeking judgment on the defense of failure to join the United States as a party is dismissed as moot.

4. The motions by the State of Minnesota, Minnesota Department of Natural Resources, and the Commissioner of Natural Resources for summary judgment based upon the Eleventh Amendment, failure to join indispensable parties, the statute of limitations, and on the merits of Phase I are denied.

5. The motion by intervenor the United States of America to dismiss the counterclaims asserted against it by defendant-intervenors John W. Thompson, Jenny Thompson, Joseph N. Karpen, LeRoy Burling, Glen E. Thompson, and Gary M. Kiedrowski under Fed.R.Civ.P. 12(b)(1) and 12(b)(6) is granted, and those counterclaims are dismissed with prejudice.

6. Trial in this case shall convene on June 13, 1994 at 9:15 a.m. Trial materials, as required by Local Rule 39.1, are due June 3, 1994.